E. Solé & Co., *S. en C.*, Plaintiff and Appellant, *v.* American Railroad Company of Puerto Rico, Defendant and Appellee.

No. 8524. Argued February 9, 1943.—Decided April 7, 1943.

*Miranda & Miranda Esteve* for appellant. *Mariano Acosta Velarde, Federico Acosta Velarde,* and *Donald R. Dexter* for appellee.

Mr. Justice Todd, Jr., delivered the opinion of the court.

The District Court of San Juan dismissed the complaint in the present damage suit, and in the opinion that it handed, it deemed that the following facts were proved:

". . . That on February 26, 1941, and around 11:45 a. m., a 'Studebaker' truck which belonged to the plaintiffs was running along Nueva Palma Street at Santurce, in a westward direction, behind another truck that was loaded with sand . . . When the truck reached the place where the railroad tracks cross the Miraflores road, and at said crossing the defendant has an employee whose duty it is to put up chains to warn the public of the approaching trains, and while said truck was passing over the tracks, its motor stopped, and despite the efforts made by the chauffeur to start it again, it did not start, and because of this, a freight train pulled by engine number 90, which was going toward Arecibo, and which belongs to the defendant, had a collision with the truck, causing damages to it, the value of which are claimed in this suit . . . that these railroad tracks, when approached from San Juan to Santurce, at the crossing where the accident happened, are in an ascending inclined planed, and form a rather sharp turn. The colliding train consisted of a locomotive and twenty-two loaded cars; the engineer, due to the obstruction caused by the boiler and to the fact that the turn was a sharp one, could not see the truck on the crossing, and it was the fireman who told him about the obstruction on the tracks, when

the train was about 40 meters away from the truck, and then the engineer immediately applied the brakes, but could not stop the train, despite all the efforts he made to reduce its speed. The locomotive stopped about 15 meters after it crossed said crossing, *and it was going at a speed of 15 kilometers per hour.* The engineer rides on the right side of the locomotive and he could not see the left side of the tracks or the front part of the truck on the crossing, until the locomotive was at a distance of about 20 meters from the side of the road; the fireman, who rides in his seat at the back of the engine, which is about 8 meters from the front of the engine's cow catcher, could not see the crossing until he was from 40 to 50 meters away from it, and the wall there is approximately 15 meters high which also does not permit him to see the left side. At this place, a train consisting of 22 loaded cars can not go up the turn at a speed of 5 kilometers per hour, *it being necessary that it should go, at least, at a speed of 10 kilometers per hour; this train was going at 15, and at that speed it was absolutely impossible for the engineer to stop the train when he learned of the presence of the truck, upon advice of the fireman, and when they were about 40 meters away from the crossing.*" (Italics ours.)

The appellant contends that the court below, by dismissing the complaint, committed four errors, to wit: 1, in discarding the expert testimony of the plaintiff; 2, in deciding that the speed at which the train of the defendant was running did not constitute negligence; 3, in deciding that the gateman was not under the duty to signal the train to stop, and that the engineer was not under the duty to keep a lookout for the signals of the gateman indicating that the tracks were clear; and 4, in dismissing the complaint for the reasons stated in the above three assignments of error.

█ The first error was committed. The court, in its opinion, and referring to the expert testimony of the plaintiff, given by Ventura Manautou, said the following:

"The plaintiff did not introduce any evidence about this particular, since the testimony of its so-called expert showed that he was not such an expert, when he said that the size or the weight of a train has no bearing on the power of the engineer to stop it in a given case . . .."

The expert testified just the opposite. In the cross-examination he answered that the tonnage of the locomotive and the weight of the cars was related to the matter of the train being stopped; that the weight of the locomotive affects the distance that the same should travel in order to stop, and at pages 51 and 52 of the transcription of the evidence the following appears:

"Q. Does a locomotive pulling five cars stop the same as one pulling twenty cars?
"A. It can not stop the same with five cars as with twenty cars.
"Q. Which one stops first?
"A. The one with five cars stops first."

What this witness testified to that may have lead the trial judge to his erroneous conclusion possibly was the negative answer that he gave to the question as to whether he knew how many tons this locomotive weighed and as to the weight of the tracks on the trains on which he had worked. It is obvious that this lack of knowledge manifested by the witness is not sufficient to discard the testimony of an expert who has positively said that a locomotive pulling five cars will stop sooner than one pulling twenty cars, and it should be presumed that one of the factors taken into consideration by the expert was precisely the size and the weight of the train.

Although this error by itself would not be sufficient to warrant a reversal, it attains importance when it is considered together with the second error assigned.

The court below, as we have already seen, decided that the train of the defendant was running at a speed of 15 kilometers per hour and that the engineer, because of the boiler and because of the turn that the tracks make before reaching the crossing, could not see plaintiff's truck at the crossing. He was told about the obstruction on the tracks by the fireman, when the train was about 40 to 50 meters away from the truck, and although then the engineer put on

the brakes, he could not stop the train until it had run 15 meters past the crossing and after colliding with the truck. There is no dispute about these facts. The dispute arises as to whether the collision was the consequence of the negligence of defendant's agents, so that the Company can be held responsible for the damages caused to the truck, and as to whether these facts constitute negligence, especially taking into consideration the speed of the train, the place of the accident, and the traffic at that place.

The trial judge in his opinion goes into a lengthy discussion of the prevailing common law rule as to the speed at which a train should run in an urban zone, and although he cites several cases, his opinion is mainly predicated on the case of *Custer* v. *Baltimore & O. R. Co.*, 55 A. 1130, decided by the Supreme Court of Pennsylvania and from which he infers the following doctrine:

"The rule that we can gather from the authorities is clearly stated in *Custer* v. *Baltimore & O. R. Co.*, and is not to the effect *that, even on crossings within the urban zone in cities and populated places the train can run at any speed compatible with the safety of its passengers and of the freight that it carries if they put up chains or gates and have persons in charge of the same there,—then arising no duty on the part of the train to reduce its speed or to stop until the engineer or the fireman discovers the danger.*" (Italics ours.)

Further on he said:

"Therefore, and in accordance with what has been already said, and with what we believe to be the unanimous accord of the jurisprudence, *it does not constitute negligence on the part of a train to run at an excessive speed on the railroad crossing of the streets of a city if they put there chains or gates and keep a person to take care of them and to protect the life of the passersby, and if at the same time the engineers by means of the whistle and of the bell give warning of their approach.* When the owner of the train takes this measures, we can not see any ground for the fear expressed by the plaintiff's attorney, as to the existence of the danger of loss of human lives. (Italics ours.)

"  *    *    *    *    *    *    *

"The only case that we think possible to happen is a case like the instant one, which will only involve damages to property and which, as was said in *Custer* v. *Baltimore & O. R. Co.*, *supra*, would be one actually exceptional. The very small losses that as a consequence of this would follow would be greatly compensated by the economic benefits that would be produced by a fast and efficient railroad service."

What the Pennsylvania Court actually decided was that in accordance with the decision of said State two propositions prevail:

"1. There is no limit to the rate of speed at which a railroad company may run its trains through the open country and over the crossing of country roads, so long as the bounds of safety to patrons are not transgressed. (Citing authorities.) 2. In cities, towns, and populous districts, the speed of trains must be moderated, or else the railroad must take reasonable precautions to make it safe for the public who have occasion to cross its tracks. (Citing authorities.) The conclusion which was reached by the trial court in this case would seem to follow naturally, that where a railroad has placed gates across a highway, and has stationed a watchman there to protect travelers on the highway, *it may run its trains at high speed, at that point, even if it be within the limits of a municipaltiy or in a populous district.*" (Italics ours.)

It is our opinion that this doctrine, applied by the inferior court, can not prevail in jurisdictions where, as in Puerto Rico, there is a provision of law which expressly fixes the speed at which trains should run within an urban zone. Subdivision (*q*) of §3 of the Public Service Law (Act No. 70 of 1917, Spec. Sess. Laws, p. 432) in its pertinent part provides that:

"If a railroad company . . . to provide its locomotives with bells and whistles which shall be used upon approaching curves, tunnels, and road or street crossings and whenever necessary as a warning of the approach of such locomotives and trains *which shall reduce their speed to a minimum on street crossings*; . . ." (Italics ours.)

Wnen a statute establishes a rule, which is to be complied with the railroads passing over street crossings, the

violation of said rule constitutes negligence *per se.* 52 C. J. 250, §1837. In *Osborne* v. *McMasters,* 41 N. W. 543, the difference between Common Law and Statutory Negligence is clearly stated:

"Negligence is the breach of legal dūty. It is immaterial whether the duty is one imposed by the rule of common law requiring the exercise of ordinary care not to injure another, or is imposed by a statute designed for the protection of others. . . . The only difference is that in the one case the measure of legal duty is to be determined upon common-law principles, while in the other the statute fixes it, so that the violation of the statute constitutes conclusive evidence of negligence, or, in other words, negligence *per se.* All that the statute does is to establish a fixed standard by which the fact of negligence may be determined."

See Prosser on Torts, p. 264, §39.

The court below in considering the scope of subdivision (q), *supra,* said the following:

"We have kept in mind subdivision (q), §3 of our Public Service Law. It imposes upon the trains the duty to reduce its speed to a minimum on street crossings; but the law does not say what should be considered as a minimum speed and we understand that it cannot be any other but *that which is compatible with the pulling power of the locomotive and the efficiency of the service, and we have already shown that the speed at which this train was travelling was the necessary speed so that it could climb up the hill which led to the crossing."* (Italics ours.)

The only two factors taken into account by the trial judge to determine what amounts to the "minimum speed" required by the law were 1, the pulling power of the locomotive and 2, the efficiency of the service, both of which are not in harmony either with the letter or the spirit of subdivision (q), *supra,* which is to safeguard the life and the property of those who travel the streets and roads that are crossed by railroads. These two factors take into account only the convenience and the necessities of the Company, with regard to the pulling power of a locomotive, and the

efficiency of the service, as regards the public. But above those two factors is a third one, which we have already pointed out; the safety of persons and property.

It does not matter that this case be, because of its facts, an extraordinary one, since it is not the normal thing that a truck will come to a stop exactly upon a railroad crossing, but its mere happening makes clear the reason for the existence of the minimum speed rule established by the law. In view of its provisions, there can not and should not prevail any other rules which approve of excessive speed upon railroad crossings if safety gates have been put up. Other situations may arise which may cause damage not only to property, but also to persons. In the instant case if the chauffeur, due to any circumstances, had not been able to get out of the truck before the arrival of the train he could have been injured and could have suffered damages. Cf. *Dominguez* v. *P. R. Ry., Light & Power Co.*, 19 P.R.R. 1034 and *Marrero* v. *American Railroad Co.*, 33 P.R.R. 201.

Of course, the existence of the third factor is conditioned upon the fact of whether it has been proved that the speed at which the train was running was, or was not, the minimum at which it could travel. If it was not, there was negligence on the part of the defendant.

Even though the court below admitted in its opinion that the train *"needed to travel at least at a speed of 10 kilometers"* in order to climb up the turn, it did not decide that this speed was the minimum fixed by the law, but that it having been proved that the train was travelling at 15 kilometers per hour, it reached the conclusion that "the speed at which the train was travelling was necessary so that it could climb the hill which led to the crossing," and that "at this speed it was absolutely impossible for the engineer to stop it."

This conclusion is not warranted by the evidence. Neither plaintiff's nor defendant's own evidence proved that the

train could go up the hill at 10 kilometers per hour. Its witness, Juan Velázquez, Chief Engineer of Shops and Depots, testified on cross-examination as follows:

"Q. Can it go up that hill at 10 kilometers per hour?

"A. Yes, sir.

"Q. Is it not true that if it goes up that hill at 10 kilometers per hour the train would stop?

"A. I think it could be. I think it could climb it.

"Q. With 22 cars?

"A. Yes, sir.

"Q. Was there any danger in the train going at 10 kilometers?

"A. No, sir.

"Q. If it was going at 10 kilometers would it stop within a shorter distance than if it was going at 15 kilometers?

"A. Yes, sir.

"Q. What difference in meters would there be if the engine was going at 10 kilometers per hour?

"A. At 10 kilometers per hour it would need 30 meters to come to a stop.

"Q. Is that locomotive built to travel at 10 kilometers per hour?

"A. Yes, sir.

"    *         *         *         *         *         *         *

"Q. If that train had been going at 10 kilometers per hour would it have stopped before it reached the crossing?

"A. Yes, sir.

"Q. And at 10 kilometers per hour, could that train climb the hill?

"A. Perhaps it could and perhaps it could not; it all would depend upon the circumstances.

"Q. With the locomotive and with the power that you know?

"A. It can climb it.

"Q. And is it easier to stop it?

"A. Yes, sir.

The witness had already testified that if this train was going at a speed of 15 kilometers per hour it would take 60 meters to make it come to a stop. (Tr. of Ev. p. 120).

The judge questioned the witness as follows:

"Judge: Q. Would a train running at 10 kilometers per hour, and taking this same train as the example, and the train coming out

of the tunnel at 10 kilometers per hour, could it stop before reaching the crossing if, when upon coming out of the tunnel; it notices something?

"A. Yes. From the tunnel to the crossing there is a distance of 120 meters.

"Q. From what distance can you start to see and can the fireman see the crossing?

"A. At about 40 meters from the crossing.

"Q. And at what distance can the train stop at that place if it is running at 10 kilometers per hour?

"A. At that place it can stop at about 30 meters without taking into account the reaction of the engineer and the fireman.

"Q. Let us take that into consideration too?

"A. Going at 10 kilometers per hour it will be an average of 2 meters per second, it will be five seconds; it will take 40 meters.

"Q. That is that it would stop right on the crossing?

"A. Yes, sir.

The defendant's counsel then asked him if he had taken into account the time that it would have taken the fireman to tell the engineer about the truck and the time that it would take the latter to see it and stop the train, to which he answered that he thought that it would take 5 seconds. The witness had previously testified that by the experiments that they had carried out with the train personnel they had established a five second average as the reaction time from the moment the engineer is advised until the moment in which he can completely carry out the four required movements for the application of the brakes. (See the case *Clark* v. *Boston & Main R. R.*, 182 A. 175, 177, in which the court gives a 2-second period for an identical maneuver by the engineer.)

Although the train's engineer testified at first that if the train was coming at 10 kilometers per hour he would not have been able to stop it before reaching the crossing, he said in another part of his testimony that if he had been given time enough he could have stopped it and that if it had been coming at 10 kilometers per hour having received a warning to stop (we assume that he referred to the fire-

man's warning) he could have stopped it before reaching the crossing. He also testified that the turn in question, due to the increase in the traffic of government trucks, "is a place of danger."

This evidence clearly shows that the minimum speed required by subdivision (*q*), *supra,* would have been complied with if the train had been running at 10 kilometers per hour and also that if the train had been running at said speed it could have stopped before or upon reaching the crossing. The train did not have to come at a speed of 15 kilometers per hour in order to climb up this small hill, and therefore, this was not the minimum speed at which it should have come, and the train's speed was the factor that made it impossible for it not to stop until after it collided with the truck on the street crossing, this making it compulsory to conclude that the negligence of the defendant was proved.

■ It is necessary, though, in order to make the defendant responsible for the damages caused to the plaintiff that this negligence be the proximate cause of the accident and that the defendant be free from contributory negligence. It is our opinion that no contributory negligence was proved, since the plaintiff's truck did not stop on the track by an act of negligence of its chauffeur but due to the accidental fact that the other truck which was going ahead of it stopped suddenly and then the motor of plaintiff's truck came to a stop and despite the efforts made during 5 minutes, by its chauffeur and his helper to start it, it did not start. If defendant's train had been running at the minimum speed required by the law on street crossings it would have stopped before, or upon reaching, the crossing and the accident would have been avoided, and therefore, the negligence of defendant's employees was the proximate cause thereof.

■ The doctrine of the last clear chance is not involved here, as appellant contends. The plaintiff does not invoke this theory since for its application he would have to admit

his own negligence in order to allege that the defendant had the last clear chance to avoid the accident. See the extensive monography contained in 92 A.L.R. 47 and *Miranda* v. *P. R. Ry L. & P. Co.*, 42 P.R.R. 694.

Plaintiff's evidence, which was not contradicted by the defendant, showed that the repairs made to plaintiff's truck, including the parts and the work done, amounted $482.30 and that even after it was repaired it had been depreciated in the amount of $200.00. This was the amount of the damages proved.

The judgment appealed from should be reversed and another entered ordering the defendant to pay to the plaintiff $682.30, plus costs.

ON MOTION FOR REHEARING

ORDER

April 27, 1943

By the Court at the suggestion of Mr. Justice Todd, Jr.

Having considered the motion filed by the appellee asking us to reconsider our judgment in this case, predicated, among other reasons that we do not deem necessary to decide anew, upon the fact that by it, this court holds that the violation of subdivision (*q*) §3 of the Public Service Law, regulating the speed of trains at street crossings constitutes negligence *per se* and not mere evidence of negligence.

Whereas, although we made reference in our opinion to authorities that hold that the violation of a statute establishing a determined speed constitutes negligence *per se,* our opinion does not have such scope since subdivision (*q*), *supra,* does not establish any determined speed but limits itself to impose the duty of reducing the speed "to a minimum at street crossings" and as we decided that, in accordance with the facts, the same trial court decided that it was proved that the train only "had to travel at least at 10 kilometers" and that despite this, it did not apply that speed as the min-

imum prescribed by the law, when it was proved by other evidence that if the train had been travelling at said speed as a minimum, the accident could have been avoided. Actually we applied the rule that the violation of the statute was evidence of negligence, which was not properly weighed by the court below together with all the surrounding circumstances in the case.

THEREFORE, the motion for reconsideration is denied.